**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT LALOR, derivatively on behalf of PRUDENTIAL FINANCIAL, INC., <br><br>     Plaintiff, <br><br> v. <br><br> CHARLES F. LOWREY, KENNETH Y. TANJI, ROBERT M. FALZON, MARK B. GRIER, THOMAS J. BALTIMORE JR., GILBERT F. CASELLAS, , MARTINA-HUND-MEJEAN, KARL J. KRAPEK, PETER R. LIGHTE, GEORGE PAZ, SANDRA PIANALTO, CHRISTIN A. POON, DOUGLAS A. SCOVANNER, JOHN R. STRANGFELD, and MICHAEL TODMAN <br><br>     Defendants, <br><br> PRUDENTIAL FINANCIAL, INC., <br><br>     Nominal Defendant. | CASE NO. <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Robert Lalor ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Prudential Financial Inc. ("Prudential " or the "Company"), files this Shareholder Derivative Complaint against Defendants Charles F. Lowrey, Kenneth Y. Tanji, Robert M. Falzon, Mark B. Grier,  Thomas J. Baltimore, Jr., Gilbert F. Casellas, Martina Hund-Mejean, Karl J. Krapek, Peter R. Lighte, George Paz, Sandra Pianalto, Christin A. Poon, Douglas A. Scovanner, John R. Strangfeld, and Michael Todman (collectively, the "Individual Defendants") for violation of federal securities laws, breaches of their fiduciary duties as directors and/or officers of Prudential, unjust enrichment, and waste of corporate assets.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, transcripts of conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Prudential, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit action filed in the United States District Court for the District of New Jersey, captioned *City of Warren Police and Fire Retirement System v. Prudential Financial, Inc., et al.*, Case No. 2:19-CV-20839 (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Prudential against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from February 15, 2019 through August 2, 2019 (the "Relevant Period") and have caused, and continue to cause, substantial harm to Prudential and its shareholders, including monetary losses and damages to Prudential's reputation and goodwill.

2.      For over 140 years, insurance has been the cornerstone of Prudential's business function. Prudential provides insurance, investment management, and other financial products and services to both individual and institutional customers throughout the United States and many other countries. The Company's principal products and services include life insurance, annuities, retirement-related services, mutual funds, and investment management. Prudential claims it is one

of the world's largest financial institutions, with over $1.6 trillion in assets under management. Prudential operates through the following three business segments: United States Individual Life and Group Insurance Division, International Insurance Division, and United States Retirement Solution and Investment Management Division. The Individual Life segment creates and delivers universal, term, and variable life insurance products to middle-income and affluent households. Notably, Prudential has accounted for the Individual Life segment as an integral part of its business because the segment has historically been lucrative.

3.      This complaint stems from Prudential overstating its financial results and understating its liabilities regarding its Individual Life business segment due to fallacious assumptions in calculating the mortality experience. This was largely due to Prudential's failure to reserve appropriately for the legacy of The Hartford's Individual Life Insurance ("Hartford") life block.

4.      Prudential's acquisition of the Hartford business occurred in January 2013. As mentioned above, although the Company's Individual Life segment had been profitable, following the amalgamation of the Hartford policies during the Relevant Period, Prudential repeatedly misrepresented the pecuniary strength of the Company.

5.      As detailed below, the Individual Defendants repeatedly caused the Company to misrepresent Prudential's growth and financial success when the Individual Defendants knew or were reckless in not knowing, that there were entrenched concerns regarding mortality assumptions, such as (1) the assumptions failed to account for adversely developing mortality experience in the Individual Life business segment, (2) the Company was not over-reserved, but instead, its reported reserves, particularly for the Individual Life business segment, were insufficient to satisfy its future policy benefits liabilities, and (3) the Company had materially

3

understated its liabilities and overstated net income as a result of flawed assumptions in calculating mortality experience.

6.     This information went undisclosed during the Relevant Period. Instead of disclosing this material information, the Individual Defendants caused the Company to state that there were no "systemic issues" regarding mortality assumptions and continued to assure its investors that Prudential's insurance reserves were "rock-solid."

7.     Approximately seven months later, On July 31, 2019, the Company finally acknowledged what the Individual Defendants had long known–that there was a continuing negative mortality trend in Individual Life. During Prudential's August 1, 2019 conference call, the Individual Defendants admitted that the mortality assumptions would decrease the Individual Life earnings by $25 million per quarter and that "it would be reoccurring for the foreseeable future."

8.     When the Individual Defendants' wrongful conduct came to light, the price of Prudential stock fell precipitously, more than 10% from close of $91.09 per share on August 1, 2019, with more than 7.6 million shares traded.

9.     As a result of the foregoing, Prudential, its chief executive officer ("CEO"), chief financial officer, and vice-chairman have been named defendants in the Securities Action by investors who allege they were damaged when they purchased Prudential shares at inflated prices during the Relevant Period.

10.     The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. The Individual Defendants' wrongful conduct will likely cost the Company millions of dollars going forward.

11.     On May 18, 2019, Plaintiff sent a letter to the Prudential Board of Directors (the "Board") demanding that the Board investigate the wrongdoing set forth herein and take appropriate action, including commencing litigation against current and former officers and directors (the "Demand").[1] Pursuant to the New Jersey statute, Plaintiff may bring a derivative action 90 days after the Demand was sent. To date, although Prudential's counsel has informed Plaintiff that its counsel was investigating the matter, Plaintiff has not received a substantive response to the Demand or date on which the purported investigation would be completed.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. § 1367(a).

14.     This Court has jurisdiction over each defendant named herein because each is either a corporation that conducts business in and maintains operations in this District, is an individual residing in this District, and/or is an individual non-resident who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) Prudential maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains offices in this District; (iii) a substantial portion of the

---

[1] A true and complete copy of the Demand is attached hereto as Exhibit A.

transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

16.     Plaintiff, Robert Lalor, is a current owner of Prudential stock and has continuously been a shareholder of Prudential since 2002.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

### Nominal Defendant

17.     Nominal Defendant, Prudential, is a New Jersey corporation with its principal executive offices located at 751 Broad Street Newark, NJ 07102.

18.     Prudential stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PRU."

### Defendant Lowrey

19.     Defendant Charles F. Lowrey ("Lowrey") is and was at all times, the Company's Chairman of the Board and Chief Executive Officer and a defendant in the Securities Action. According to the Company's Schedule 14A filed with the SEC on March 26, 2020 ( the "2020 Proxy Statement"), Lowrey beneficially owns approximately 79,941 shares of the Company's common stock, valued at $5,043,477.69 based upon the closing price on November 4, 2020.

20.     For the fiscal year ending on December 31, 2019, Lowrey received $15,132,939 in compensation from the Company. This included $1,200,000 in salary, $4,980,009 in stock awards, $1,666,665 in option awards, $6,085,252 in non-equity incentive plan compensation, $1,128,436

in change in pension value and non-qualified deferred compensation earnings, and $72,577 in all other compensation.

21.     The Company's 2020 Proxy Statement stated the following about Lowrey:

Mr. Lowrey has been Chairman and CEO of Prudential Financial, Inc. since December 2018. Prior to assuming his current roles, Mr. Lowrey served as EVP and Chief Operating Officer of Prudential's International businesses from 2014 to 2018. Previously, he was EVP and Chief Operating Officer of Prudential's U.S. Businesses from 2011 to 2014. Mr. Lowrey also served as President and CEO of PGIM, Prudential's global investment management business, and as CEO of its real estate investment business, PGIM Real Estate. Before joining Prudential in 2001, he was a managing director and head of the Americas for J.P. Morgan's Real Estate and Lodging Investment Banking group, where he began his investment banking career in 1988. Earlier, he spent four years as a managing partner of an architecture firm he founded in New York City. During this time, he became a registered New York architect.

**Defendant Tanji**

22.     Defendant Kenneth Y. Tanji ("Tanji") is and was at all times, the Company's Executive Vice President, Chief Financial Officer and a defendant in the Securities Action. According to the Company's 2020 Proxy Statement, Tanji beneficially owns approximately 22,259 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Tanji beneficially owns approximately $1,404,320.31 of PRU stock.

23.     For the fiscal year ending on December 31, 2019, Defendant Tanji received $4,867,375 in total compensation from the Company. This included $600,000 in salary, $1,560,046 in stock awards, $522,102 in option awards, $1,643,475 in non-equity incentive plan compensation, $491,659 in change in pension value and non-qualified deferred compensation earnings, and 50,093 in all other compensation.

24.     According to Prudential's Company's website:

Ken Tanji is executive vice president and chief financial officer of Prudential Financial, Inc. He was appointed in December 2018 and oversees global financial management matters, including financial reporting, investor relations, treasury, tax, and corporate development. Prior to this position, Tanji was senior vice president and treasurer at Prudential Financial, Inc., where he was responsible for management of the company's capital, liquidity, borrowing, and cash management. Prior to taking on the treasurer role in 2013, Tanji served as chief financial officer of Prudential's International businesses. In this position, he was responsible for the financial and actuarial management of Prudential's International Insurance and Investment businesses operating in ten countries in Asia, South America, and Europe. Previously, Tanji was senior financial officer of Prudential Annuities, responsible for its financial reporting, planning, analysis, and capital management functions. In addition, he was Prudential's business representative for its retail brokerage joint venture with Wachovia Securities from 2003 through 2009.[2]

**Defendant Falzon**

25.     Defendant Robert M. Falzon ("Falzon") is and was at all times, the Company's Vice Chairman of the Board and a defendant in the Securities Action. In August 2019, Falzon was nominated as director of the board. According to the 2020 Proxy Statement, Falzon beneficially owns approximately 79,381 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Falzon beneficially owns approximately $5,008,147.29 of PRU stock.

26.     For the fiscal year ending on December 31, 2019, Falzon's total compensation $12,082,978. This included $1,000,000 in salary, $3,960,144 in stock awards, $1,325,304 in option awards, $4,754,861 in non-equity incentive plan compensation, $938,263 in change in pension value and non-qualified deferred compensation earnings, and $104,406 in all other compensation.

27.     The Company's 2020 Proxy Statement stated the following about Falzon:

Mr. Falzon has been Vice Chairman of Prudential Financial since December 2018 and oversees the finance, risk, investments, actuarial, communications,

---

[22] See the full corporate biography of Kenneth Tanji regarding his role and accomplishments at https://news.prudential.com/ken-tanji.htm.

information & technology, and corporate social responsibility functions. Previously, he served as EVP and CFO of Prudential Financial from 2013 to 2018, and has been a member of the Company's Executive Leadership Team since 2013. Mr. Falzon also served as SVP and Treasurer of Prudential Financial from 2010 to 2013. Mr. Falzon has been with Prudential since 1983, serving in various positions including Managing Director at PGIM Real Estate ("PGIM RE"), head of PGIM RE's Global Merchant Banking Group and CEO of its European business. He was also Senior Portfolio Manager, a member of PGIM RE's Global Investment and Management Committees, Chairman of the Global Real Estate Securities Investment Committee and the Currency Hedging Committee, and a member of the Investment Committee for Prudential Investment Management.

**Defendant Grier**

28.     Defendant Mark B. Grier ("Grier") was a director of the Company from December 1999 to January 2001 and January 2008 to August 2019.  Grier was also Prudential's Vice Chairman of the Board from August 2002 to December 2018.  According to the 2020 Proxy Statement, Grier beneficially owns approximately 406,213 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Grier beneficially owns approximately $ 25,627,978.17 of PRU stock.  Grier retired from Prudential on August 31, 2019.

29.     For the fiscal year ending on December 31, 2019, Grier's total compensation was $17,179,235. This included $853,596 in salary, $4,800,011 in stock awards, $1,606,425 in option awards, $6,791,562 in non-equity incentive plan compensation, $2,872,032 in change in pension value and non-qualified deferred compensation earnings, and $255,609 in all other compensation. Additionally, in February 2020, the Company's Compensation Committee provided a cash payment of $5,335,000 to Defendant Grier in lieu of long-term incentive awards in consideration of his performance in 2019.

30.     The Company's 2020 Proxy Statement stated the following about Grier:

Mr. Grier has served as Vice Chairman of Prudential Financial since 2007 and a member of the Company's Executive Leadership Team since 2002. Mr. Grier will

be retiring from the Company no later than August 30, 2019 and will leave the Board at that time. Upon his retirement, it is expected that Robert Falzon's service on the Board will commence. From April 2007 through January 2008, Mr. Grier served as Vice Chairman of Prudential Financial overseeing the International Insurance and Investments divisions and Global Marketing and Communications. Mr. Grier was CFO of Prudential Insurance from 1995 to 1997. Prior to joining Prudential, Mr. Grier was an executive with Chase Manhattan Corporation.

**Defendant Baltimore**

31.     Defendant Thomas J. Baltimore ("Baltimore") is, and was at all times, a director of the Company. Baltimore is also Chairman of the Company's Investment, Risk, and Executive Committee and a member of the Compensation Committee. Currently, he is no longer a member of the Compensation Committee.  According to the 2020 Proxy Statement, Baltimore beneficially owns approximately 500 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Baltimore beneficially owns approximately $31,545 of PRU stock.

32.     For the fiscal year ending on December 31, 2019, Baltimore received $405,000 in total compensation from the Company. This included $255,000 in salary and $150,000 in stock awards.

33.     The Company's 2020 Proxy Statement stated the following about Baltimore:

Mr. Baltimore has been Chairman, President and CEO of Park Hotels & Resorts, Inc. (a NYSE-listed lodging real estate investment trust) since January 2017. Between May 2016 and January 2017, Mr. Baltimore was President and CEO of the planned Hilton Real Estate Investment Trust. Previously, he was President and CEO of RLJ Lodging Trust (a NYSE-listed real estate investment company) from May 2011 to May 2016. He served as Co-Founder and President of RLJ Development, LLC (RLJ Lodging's predecessor company) from 2000 to May 2011. He served as VP, Gaming Acquisitions, of Hilton Hotels Corporation from 1997 to 1998 and later as VP, Development and Finance, from 1999 to 2000. He also served in various management positions with Host Marriott Services, including VP, Business Development, from 1994 to 1996.

**Defendant Casellas**

34.     Defendant Gilbert J. Casellas ("Casellas") is and was at all times, a director of the Company. Casellas is also Chairman of the Company's Corporate Governance and Business Ethics Committee and member of the Executive and Risk Committees. In addition to his previously mentioned roles at Prudential, he is currently a member of the Audit Committee. According to the 2020 Proxy Statement, Casellas beneficially owns approximately 500 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Casellas beneficially owns approximately $31,545 of PRU stock.

35.     For the fiscal year ending on December 31, 2019, Casellas received $324,800 in total compensation from the Company. This included $173,750 in salary, $150,000 in stock awards, and $1,100 in all other compensation.

36.     The Company's 2020 Proxy Statement, stated the following about Casellas:

Mr. Casellas served as Chairman of OMNITRU (a consulting and investment firm) from 2011 to 2017. He was VP, Corporate Responsibility, of Dell Inc. (a global computer manufacturer) from 2007 to 2010. He served as Member of Mintz Levin Cohn Ferris Glovsky & Popeo, PC from June 2005 to October 2007. He served as President of Casellas & Associates, LLC (a consulting firm) from 2001 to 2005. During 2001, he served as President and CEO of Q-linx, Inc. and served as President and COO of The Swarthmore Group, Inc. from January 1999 to December 2000. Mr. Casellas served as Chairman, U.S. EEOC from 1994 to 1998 and General Counsel, U.S. Department of the Air Force, from 1993 to 1994.

**Defendant Mejean**

37.     Defendant Martina Hund-Mejean ("Mejean") is and was at all times, a director of the Company. Mejean is also a member of the Audit Committee. Currently, Mejean is Chairman of the Company's Business Ethics Committee and a member of the Executive and Risk Committees. According to the 2020 Proxy Statement, Mejean beneficially owns approximately 128 shares of the Company's common stock. Based upon the closing price of the Company's

common stock on November 4, 2020, Mejean beneficially owns approximately $8,075.52 of PRU stock.

38.     For the fiscal year ending on December 31, 2019, Mejean received $305,800 in total compensation from the Company. This included $150,000 in salary, $150,000 in stock awards, and $5,000 in all other compensation.

39.     The Company's 2020 Proxy Statement, stated the following about Mejean:

Ms. Hund-Mejean served as CFO and as a member of the Management Committee at MasterCard Worldwide (a technology company in the global payments industry) from 2007 to 2019. Ms. Hund-Mejean served as SVP and Corporate Treasurer at Tyco International Ltd. from 2003 to 2007; SVP and Treasurer at Lucent Technologies from 2000 to 2002; and held management positions at General Motors Company from 1988 to 2000. Ms. Hund-Mejean began her career as a credit analyst at Dow Chemical in Frankfurt, Germany.

### Defendant. Krapek

40.     Defendant Karl J. Krapek ("Krapek") is and was at all times, a director of the Company. Krapek is also a member of the Compensation, Executive and Risk Committees. Currently, he is a member of the Compensation Committee. According to the 2020 Proxy Statement, Krapek beneficially owns approximately 38,455 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Krapek beneficially owns approximately $2,426,125.95 of PRU stock.

41.     For the fiscal year ending on December 31, 2019, Krapek received $335,000 in total compensation from the Company. This included $180,000 in salary, $150,000 in stock awards, and $5,000 in all other compensation.

42.     The Company's 2020 Proxy Statement, stated the following about Krapek:

Mr. Krapek served as President and COO of United Technologies Corporation (UTC) from 1999 until his retirement in January 2002. Prior to that time, Mr. Krapek held other management positions at UTC, which he joined in 1982. Mr.

Krapek is also the co-founder of The Keystone Companies, which was founded in 2002, and develops residential and commercial real estate.

**Defendant Lighte**

43.     Defendant Peter R. Lighte ("Lighte") is and was at all times, a director of the Company. Lighte is also a member of the Corporate Governance and Business Ethics Committee and Investment. According to the 2020 Proxy Statement, Lighte beneficially owns approximately 80 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Lighte beneficially owns approximately $5,047.20 of PRU stock.

44.     For the fiscal year ending on December 31, 2019, Lighte received $300,000 in total compensation from the Company. This included $150,000 in salary and $150,000 in stock awards.

45.     The Company's 2020 Proxy Statement, stated the following about Lighte:

Mr. Lighte served as Vice Chairman, J.P. Morgan Corporate Bank, China (a global financial services company), from 2010 to 2014, and the founding Chairman of J.P. Morgan Chase Bank China, from 2007 to 2010. Prior to that, he headed the International Client Coverage for Treasury and Securities Services in J.P. Morgan's European Global Operating Services Division and was instrumental in re-establishing its corporate bank in London. Mr. Lighte previously served as President of Chase Trust Bank in Tokyo from 2000 to 2002. He was also the founding representative in Beijing of Manufacturers Hanover Trust Company. Mr. Lighte has also taught at several academic institutions, including Middlebury College and the University of Santa Clara.

**Defendant Paz**

46.     Defendant George Paz ("Paz") is and was at all times, a director of the Company. Paz is also a member of the Company's Audit Committee. In addition to his previously mentioned roles at Prudential, he is currently a member of the Finance Committee. According to the 2020 Proxy Statement, Paz beneficially owns approximately 500 shares of the Company's common

stock. Based upon the closing price of the Company's common stock on November 4, 2020, Paz

beneficially owns approximately $31,545 of PRU stock.

47.     For the fiscal year ending on December 31, 2019, Paz received $305,000 in total

compensation from the Company. This included $150,000 in salary, $150,000 in stock awards,

and $5,000 in all other compensation.

48.     The Company's 2020 Proxy Statement, stated the following about Paz:

Mr. Paz was Non-Executive Chairman of Express Scripts Holding Company
(Express Scripts), a prescription benefit management company, from May 2016
to December 2018 and served as Chairman and CEO of Express Scripts from May
2006 to May 2016 after being appointed CEO in April 2005. Mr. Paz also served
as President of Express Scripts from October 2003 to February 2014 and as a
director from January 2004 to December 2018. He joined Express Scripts in 1998
as SVP and CFO. Prior to joining Express Scripts, Mr. Paz was a partner at
Coopers and Lybrand from 1988 to 1993 and 1996 to 1998 and served as EVP
and CFO for Life Partners Group from 1993 to 1995.

**Defendant Pianalto**

49.     Defendant Sandra Pianalto ("Pianalto") is and was at all times, a director of the

Company. Pianalto is also a member of the Company's Corporate Governance and Business Ethics

Committee and Finance Committee. According to the 2020 Proxy Statement, Pianalto beneficially

owns approximately 451 shares of the Company's common stock. Based upon the closing price of

the Company's common stock on November 4, 2020, Pianalto beneficially owns approximately

$28,453.59 of PRU stock.

50.     For the fiscal year ending on December 31, 2019, Pianalto received $306,350 in

total compensation from the Company. This included $153,750 in salary, $150,000 in stock

awards, and $2,600 in all other compensation.

51.     The Company's 2020 Proxy Statement, stated the following about Defendant

Pianalto:

Ms. Pianalto served as President and CEO of the Federal Reserve Bank of Cleveland (the Cleveland Fed) from February 2003 until her retirement in May 2014. She was the First VP and COO of the Cleveland Fed from 1993 to 2003 and served as its VP and Secretary to the Board of Directors from 1988 to 1993. Ms. Pianalto also served in various supervisory roles at the Cleveland Fed from 1983 to 1988. Prior to joining the Cleveland Fed, Ms. Pianalto was an economist at the Board of Governors of the Federal Reserve System and served on the staff of the Budget Committee of the U.S. House of Representatives.

### Defendant Poon

52.     Defendant Christina A. Poon ("Poon") is and was at all times, a director of the Company. Poon is also Chairman of the Company's Finance Committee, and a member of the Executive, Investment, and Risk Committees. In addition to her previously mentioned roles at Prudential, she is currently Chairman of the Executive Committee. According to the 2020 Proxy Statement, Poon beneficially owns approximately 11,583 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Poon beneficially owns approximately $730,771.47 of PRU stock.

53.     For the fiscal year ending on December 31, 2019, Poon received $322,500 in total compensation from the Company. This included $172,500 in salary and $150,000 in stock awards.

54.     The Company's 2020 Proxy Statement, stated the following about Poon:

Ms. Poon has served as Executive in Residence at the Max M. Fisher College of Business at The Ohio State University since September 2015 and served as Professor of Management and Human Resources at The Max M. Fisher College of Business from October 2014 to September 2015. Ms. Poon previously served as Dean and John W. Berry, Sr. Chair in Business at The Max M. Fisher College of Business at The Ohio State University from April 2009 until October 2014. She served as Vice Chairman and Member of the Board of Directors of Johnson & Johnson from 2005 until her retirement in March 2009. Ms. Poon joined Johnson & Johnson in 2000 as Company Group Chair in the Pharmaceuticals Group. She became a member of Johnson & Johnson's Executive Committee and Worldwide Chair, Pharmaceuticals Group, in 2001, and served as Worldwide Chair, Medicines, and Nutritionals, from 2003 to 2005. Prior to joining Johnson & Johnson, she served in various management positions at Bristol-Myers Squibb for 15 years.

**Defendant Scovanner**

55.     Defendant Douglas A. Scovanner ("Scovanner") is and was at all times, a director of the Company. Scovanner is also Chairman of the Company's Audit Committee and a member of the Risk and Executive Committee. According to the 2020 Proxy Statement, Scovanner beneficially owns approximately 12,000 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Scovanner beneficially owns approximately $757,080 of PRU stock.

56.      For the fiscal year ending on December 31, 2019, Scovanner received $335,000 in total compensation from the Company. This included $185,000 in salary and $150,000 in stock awards.

57.     The Company's 2020 Proxy Statement, stated the following about Scovanner:

Mr. Scovanner has been Founder and Managing Member of Comprehensive Financial Strategies, LLC, a management consulting firm, since October 2013. Previously, he served as Chief Financial Officer (1994 to 2012) and EVP (2000 to 2012) of the Target Corporation (a North American retailer). Prior to joining the Target Corporation, Mr. Scovanner held various management positions at The Fleming Companies, Inc., Coca-Cola Enterprises, Inc., The Coca-Cola Company and the Ford Motor Company from 1979 to 1994.

**Defendant Strangfeld**

58.     Defendant John R. Strangfeld ("Strangfeld") was the former CEO and served as a Non-Executive Chairman of the Board from November 2018 through April 5, 2019.

59.      For the fiscal year ending on December 31, 2019, Strangfeld received $388,492 in total compensation from the Company. This included $375,000 in salary and $13,492 in all other compensation.

**Defendant Todman**

60.     Defendant Michael Todman ("Todman") is and was at all times, a director of the Company. Todman is also a member of the Company's Finance and Compensation Committee. In addition to his previously mentioned roles at Prudential, he is currently Chair of the Compensation Committee and a member of the Executive Committee. According to the 2020 Proxy Statement, Todman beneficially owns approximately 450 shares of the Company's common stock. Based upon the closing price of the Company's common stock on November 4, 2020, Todman beneficially owns approximately $28,390.50 of PRU stock.

61.      For the fiscal year ending on December 31, 2019, Defendant Todman received $305,000 in total compensation from the Company. This included $150,00 in salary, $150,000 in stock awards, and $5,000 in all other compensation.

62.     The Company's 2020 Proxy Statement, stated the following about Todman:

> Mr. Todman served as Vice Chairman of the Whirlpool Corporation (Whirlpool), a global manufacturer of home appliances, from November 2014 to December 2015. Mr. Todman previously served as President of Whirlpool International from 2006 to 2007 and 2010 to 2014, as well as President, Whirlpool North America, from 2007 to 2010. Mr. Todman held several senior positions with Whirlpool over his career, including EVP and President of Whirlpool Europe from 2001 to 2005 and EVP, Whirlpool North America, in 2001.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

63.     By reason of their positions as officers, directors and/or fiduciaries of Prudential and because of their ability to control the business and corporate affairs of Prudential, the Individual Defendants owed Prudential and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage Prudential in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Prudential and its shareholders to benefit all shareholders equitably.

64.   Each director and officer of the Company owes Prudential and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

65.   As fiduciaries of Prudential, The Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

66.   The officers and directors of Prudential were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

67.   Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. As Prudential's directors and officers, the Individual Defendants knowingly acted with reckless disregard of their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

68.   The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

69.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things the Individual Defendants were required to:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New Jersey, the United States, and pursuant to Prudential's Code of Conduct and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Prudential conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection in addition to that, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic, accurate records and reports of the business and internal affairs of Prudential and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Prudential's operations would comply with all laws and Prudential's financial statements and

regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)   exercise reasonable control and supervision over Company's officers and employees' public statements and any other reports or information that the Company was required by law to disseminate;

(g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)   examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.   Each of the Individual Defendants further owed Prudential and the shareholders the duty of loyalty requiring that each favor Prudential's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

71.   At all times relevant hereto, the Individual Defendants were the agents of each other and Prudential and were at all times acting within the course and scope of such agency.

72.   The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with Prudential.

73.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Prudential.

## A.      Prudential's Code of Conduct

74.      Prudential has a Code of Conduct, which states that the following principles are the

foundation for Prudential's policies:

"Act with integrity and make decisions based on high ethical standards" and "understand and honor the letter and spirit of the laws and regulations that apply to Prudential's businesses."

75.      The Code of Conduct further details how an individual may report ethical

violations:

Promoting an ethical culture is the responsibility of all employees and sales associates. Employees and sales associates who are aware of or reasonably suspect any unethical or illegal behavior or practices, violations of laws, regulations or policies are obligated to report this information promptly within Prudential, consistent with the local laws of the country in which they work. Employees and sales associates can report an issue or seek advice on a matter by using any of the following Prudential resources applicable to them:

- Supervisors

- Management

- Human resources contact

- Compliance and/or legal contact

- Business ethics contact

- Global Business Ethics & Integrity

(See contact information on page 21.)

Certainty that the Code of Conduct or that a law or regulation has been violated is not required before seeking assistance. All of these resources seriously consider all concerns that are raised and are provided to offer guidance, and to address the issues  brought to their attention.

76.      The Code of Conduct explains how an individual may report financial concerns:

The Audit Committee of Prudential's Board of Directors has established Global Business Ethics & Integrity as the central facility for the receipt, retention and treatment of any complaints received from internal or external sources regarding

accounting, internal accounting controls or auditing matters, including confidential, anonymous (where legally permitted) submissions by employees and sales associates of concerns regarding questionable accounting or auditing matters.

Anyone may submit concerns regarding accounting, internal accounting controls or auditing matters to Global Business Ethics & Integrity in a number of ways. Please visit https://prudential.ethicspoint.com for more information.

In addition, concerns may be submitted directly to the Audit Committee at the following address: P.O. Box 949 Newark, New Jersey 07101-0949 USA

Employees and sales associates may also report concerns, as applicable, to their local Prudential resource such as the business ethics contact or management, who must forward the information to Global Business Ethics & Integrity.

77.    The Coded of Conduct details how an individual should conduct his or her actions

in an ethical manner:

Living up to Prudential's high ethical standards is more than just doing what the law requires. Those associated with Prudential are expected to demonstrate a strong moral compass and make a personal commitment to do what's right, every day, in every business situation. Act with courage, integrity and honesty at all times when engaged in Prudential business.

Sometimes there is uncertainty about the right course of action. Ask if the action is good for Prudential's customers and shareholders. Ask, "Would I be comfortable with this action if it came to the attention of my fellow employees or sales associates, friends, family members or the media?" If the answer is "no," then do not do it. Everyone associated with Prudential is expected to make business decisions based on what is right, not simply what is easy or expedient. Do not allow personal interests (including investments, business dealings or other personal or family activities) to conflict with or appear to conflict with the interests of Prudential, its shareholders or customers. Report suspected unethical or illegal behavior according to applicable laws and processes. Prudential will not tolerate retaliation against anyone who, in good faith, raises such a concern.

What to do:

- Act in an honest, fair and ethical manner in all business interactions.

- Use Prudential's property for appropriate business purposes only.

- ▪ Disclose activities, financial interests or relationships that may be or may appear to be a conflict of interest. Obtain prior, written approval, where appropriate.

- • Prevent improper use and disclosure of proprietary information not available to the general public.

- • Create an environment where everyone feels they can voice their opinions.

- • Report suspected unethical or illegal behavior to the appropriate Prudential resources.

78.     Lastly, the Code of Conduct explains what is expected of an individual regarding

compliance with regulations and applicable laws:

> Prudential is expected to know, understand and comply with laws and regulations applicable to its businesses, wherever located. You are responsible for knowing and understanding the laws and regulations that apply to your job or business. Prudential expects everyone associated with Prudential to conduct business in compliance with applicable laws and regulations. Consistent with the local laws of a country, there may also be an obligation to report, prevent or stop unethical or illegal behavior when it becomes known.

> In some cases, our policies specifically outline your responsibilities under certain laws and regulations. For example, internal policies specify strict guidelines about how Prudential's products can be marketed or sold, and the required licensing, communications and behavior of those who sell the products. Misconduct may be punished, up to and including termination of employment and, in some cases, criminal prosecution.

- • Be truthful and accurate in your business dealings.

- • Know, understand and comply with the laws and regulations that apply to your job or business.

- • Safeguard personally identifiable and nonpublic proprietary information; limit access to only those who need it to do their jobs at Prudential.

- •  Let only appropriately licensed and registered individuals market or sell Prudential's products.

- •  Submit marketing and sales material for review and approval by the compliance team prior to allowing it to be used or distributed.

- Obtain pre-approval for any charitable fundraising or other charitable events in connection with Prudential.

- Watch for warning signals regarding behaviors, processes or reporting that you observe in your interactions with employees and third parties.

### B. Audit Committee Members Have Additional Duties

79.   The Audit Committee Charter states in relevant part:

> The Audit Committee's primary purposes are to assist the Board of Directors ("Board") in its oversight of:

- the integrity and audit of the Company's financial statements;

- the Company's accounting, financial reporting and disclosure processes and the adequacy of the systems of disclosure and internal control established by management;

- processes established by management to provide compliance with legal and regulatory requirements;

- the independent auditor's qualifications, performance and independence; and

- the performance of the Company's internal audit function.

80.   As part of an Audit Committee Members duties, an individual must perform the following:

(i)     receive periodic reports from the Chief Financial Officer and/or the Principal Accounting Officer relating to significant accounting developments including emerging issues, the impact of accounting changes where material, including the effect of regulatory and accounting initiatives, the treatment of any prior period misstatements in accordance with SEC and accounting guidance, as well as off-balance sheet structures;

(ii)    receive periodic reports from the Chief Financial Officer and/or Principal Accounting Officer relating to the possible impact of any impending significant changes in generally accepted accounting principles, as well as statutory accounting practices;

(iii)   discuss any significant matters arising from any audit, including any audit problems or difficulties encountered in the course of the performance of the audit and management's response, whether raised by management, the

Internal Audit Department or the independent auditor, relating to the Company's financial statements; and

(iv)    receive reports from management as required by the Committee's established procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

83.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took

the actions set forth herein. The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

84.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

85.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Prudential and was at all times acting within the course and scope of such agency.

## BACKGROUND

86.     The Company was incorporated in 1875. It is headquartered in Newark, New Jersey, with satellite offices in Latin America, Asia Pacific, Europe, Middle East, and Africa. On or about April 9, 2001, Prudential stock began trading on the NYSE under the ticker symbol "PRU." Prudential claims it is one of the largest diversified financial institutions in the world, with assets totaling beyond $1.4 trillion. Prudential has offered insurance since its inception, 140 years ago, along with other services, such as securities, investments, residential real estate, employee benefits, home mortgages, and the corporate relocation industry. Prudential offers these products and services to individuals and institutional customers through proprietary and third-party distribution networks.

87.     Prudential's portfolio of businesses primarily operates within the following three segments: U.S Retirement Solutions and Investment Management Division, U.S. Individual Life and Group Insurance Division, and International Insurance Division.

88.     Under the U.S Retirement Solutions and Investment Management Division, the Individual Annuities segment offers and delivers fix and variable annuity products to fiscally secure households, and the Retirement segment offers retirement plans, pension risk transfer resolutions, and structured settlement annuities Under the U.S. Individual Life and Group Insurance Division, the Individual Life segment offers and delivers term and universal life products and individual life insurance products. The Group Insurance segment offers and delivers long term and short-term group disability group life and group corporate bank and trust-owned life insurance. Lastly, the International Insurance Division segment offers and delivers retirement and individual life insurance to individuals in foreign countries.

89.     Historically, the Individual Life Segment has been integral to Prudential's business function.

90.     On January 2, 2013, Prudential announced that the Company completed the acquisition of Hartford's individual life insurance business through a reinsurance transaction (the "Acquisition"). The total cash consideration was $615 million consisting primarily of a ceding commission to provide reinsurance for approximately 700,000 Hartford life insurance policies with a face amount in force of approximately $135 billion. This Acquisition increased the Company's scale in the U.S. individual life insurance market, particularly universal life products, and provided complementary distribution opportunities through expanded wirehouse and bank distribution channels.

91.     Immediately, Prudential saw revenues increase by $788 million. Net investment income increased by $174 million, reflecting business growth, including the impact of higher asset balances from the acquired Hartford Life Business.

92.     In June 2016, the National Association of Insurance Commissioners implemented a proposal that initiated a principles-based reserving approach for life insurance products. Principles-based reserving substitutes the reserving methods for life insurance products for which the current formulaic basis for reserves may not truthfully reflect the dangers or costs of the liability or responsibilities of the insurer.[3] The principle-based reserving approach had a three-year phase period. In 2017, Prudential adopted this approach for its universal life products. Prudential assured its investors it would continue to monitor and assess the impact of implementing the new accounting and modeling standards.

93.     Prudential had abysmal results in 2017 for the Individual Life business segment. The Individual Life segment reported an adjusted operating income of $98 million for the current quarter, compared to $138 million in the year-ago quarter. The decrease primarily reflects unfavorable claims experience and the ongoing adverse impact of the second quarter 2017 annual review and update of actuarial assumptions and universal policies acquired from Hartford. Prudential continued to assure investors that the Acquisition remained positive.

94.     Leading up to the Relevant period, Prudential's financial outlook for fiscal year 2019 remained optimistic, noting earnings per share guidance ("EPS") of $12.50 to $13 and a one

---

[3] Principle-based reserving ("PBR") is a new statutory reserve regulation that merges company-specific assumptions with prescribed rule-based requirements. For a detailed explanation of actuarial calculations see generally: https://contingencies.org/details-behind-principle-based-reserving-implementation/#:~:text=Principle%2Dbased%20reserving%20(PBR),with%20prescribed%20rule%2Dbased%20requirements.&text=As%20companies%20enter%20into%20the,regulatory%20guardrails%2C%20and%20actuarial%20ambiguity.

standard deviation change from expected mortality experience impacts annual pre-tax AOI by $55 million to $80 million.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

95.    On February 15, 2019, the Individual Defendants caused the Company to file with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 ("FY18 10-K"). The FY18 10-K detailed that the Company's assumptions regarding how reserves were calculated based on "*company's experience*, industry experience and/or *other factors, as applicable*." Although the assumptions regarding reserves are amorphous, the Company unambiguously stated that it would modify actuarial assumptions annually regarding morbidity mortality, retirement, and policyholder assumptions*, unless a "material change is observed in an interim period that [Prudential] feel is indicative of a long-term trend."* Prudential further stated that changes were expected "*to be gradual over the long term*."[4]

96.    Additionally, the Company wrongfully claimed that current reserves were likely understated, thus creating a deceptive appearance regarding Prudential's pecuniary success both currently and going forward:

> In a sustained low-interest-rate environment, there is an increased likelihood that **the reserves determined based on best estimate assumptions may be greater than the net liabilities.**

97.    The Company indicated if there were any variations regarding mortality trends, the change may demand an increase in reserves, but the economic financial impact would not be immediately realized:

> If **this risk were to emerge**, **the Company would update assumptions** used to calculate reserves for in-force business, which may result in additional assets needed to meet the higher expected annuity claims or earlier expected life claims. **An increase in reserves due to revised assumptions has an immediate impact** on

---

[4] Emphasis added throughout unless noted otherwise.

*our results of operations* and financial condition; *however, economically the impact is generally long term as the excess outflow is paid over time*.

98.     During an earnings call to discuss Prudential's FY18 10-K, Defendant Lowrey, in his closing remarks, bolstered the Company's financial appearance:

*We have the scale to invest* for the long term and a *rock solid balance sheet* to provide our customers with comfort and knowledge of and *confidence in our stability throughout the market cycles.*

99.     In an analyst report, Vice Chairman Falzon falsely reiterated that the growth prospects of Prudential were favorable. Falzon remarked that there are "*no systemic issues  with underwriting or mortality assumptions, and that results should stabilize*."

On May 1, 2019, Prudential issued a press release announcing its first quarter 2019 results, where Defendant Lowery stated that: "*The first quarter of 2019 marked a solid start to the year for Prudential."* Moreover, Lowery falsely emphasized the Company's ability to return capital to shareholders via dividends and share repurchase due to "*a rock-solid  balance sheet."*

100.     The press release also stated that:

The *Individual Life segment* reported adjusted operating income of $105 million for the current quarter, compared to $36 million in the year-ago quarter. *Underwriting experience in the current quarter was consistent with our seasonal expectations*.

101.     On May 3, 2019, the Company filed with the SEC its Form 10-Q first quarter financial results for the period ended March 31, 2019 ("1Q19"). The 1Q19 stated that :

*Adjusted operating income increased $20 million*, primarily reflecting higher underwriting results  *driven by a favorable impact from mortality experience*, net of  reinsurance.

\*       \*       \*

The increase in general and administrative expenses was primarily driven by higher costs supporting business growth initiatives. *The higher contribution from reserve experience primarily* reflected higher *mortality gains on a comparative basis within our pension risk transfer business.*

102.     During an earnings call to discuss the 1Q19 results, Defendant Lowery continued to tout the strength of the balance sheet in various business segments and in his closing remarks, he stated the following:

> *We feel confident about our strategy*, the scale of our businesses **and the strength of our balance sheet.** As we continue to focus on our businesses and deploy new technology to grow and expand our markets, we will make an even greater impact on the financial lives of our customers and in the global community.
> **This should lead to growth in our businesses and greater value for our shareholders**.

103.     Stephen Pelletier, one of the Company's Executive Vice President, was unable to explain or clarify why Life mortality in the Individual Life business was unfavorable:

> I think that we did see in this quarter, **our Life mortality in the Individual Life business have some -- have some experience that was counter to what we normally see** as -- as the seasonal trends. Normally, the **third quarter tends to be a positive experience in Life mortality, it didn't play out that way this quarter**. We saw the unfavorable experience in this quarter in blocks that have really generally trended quite favorably over time and as a result**, we believe that this quarter's result is more of a random fluctuation rather than indicative of any underlying issues or trends.**

104.     At the Company's Investor's Day Conference on June 5, 2019, Tanji glossed over the true reason as to the unfavorable expectation of the Company's mortality and morbidity assumptions:

> And then the third area of interest involves our individual life business in our mortality experience. **And our recent experience has been in between range of what we'd expect normal volatility**, but **net it has been below our experience.** So, in ordinary course in our rigorous process, we will factor that in to our study and **we'll take a closer look at that.**
>
> \*       \*       \*
>
> So last year, we updated our **morbidity assumptions to more prudent assumptions**. And since last year, **our experience has been consistent with our updated assumptions**. Actually, they've been just a little bit better. So albeit that's a very small sample size, we'll factor that in to our analysis along with industry data.

105.     Given the ambiguous opening statement with respect to mortality assumptions, analyst Suneet Kamath from Citigroup Global Markets pressed Tanji for clarity on the issue:

**Suneet Kamath- Analyst**

And then when you're going to the assumption review commentary, you talked about the life business. And I just wondered, I missed what you've said. Has mortality been more favorable is that relative to what your expectations are or...?

**Kenneth Y. Tanji- Chief Financial Officer and Executive Vice President**

No. It's very quarter-to-quarter, both positive and negative. If you looked at it, it has been slightly negative and we're taking a look at that.

106.     The statement from the press release, the earnings calls, FY19 10-K, 1Q19 referenced above were materially false and misleading because they failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants failed to disclose that reserves were materially understated which has a direct nexus to the misleading statements regarding EPS and operating earnings. Engaging in such conduct is a violation of SEC and GAAP disclosure regulations. The Individual Defendants caused the Company to disseminate false information regarding the financial strength of the balance sheet, ensuring its investors that Prudential was in a continued state of exponential growth. On the contrary, the Company was incapable of correctly reserving for the legacy Hartford life block due to the excessive deviations in the quarter to quarter mortality experience. Since the Hartford life block failed to reserve properly for current and future policy benefit liabilities, as a direct result, Prudential grossly overstated its net income and severely understated its liabilities.

## THE TRUTH BEGINS TO EMERGE

107.     On July 31, 2019, the Company issued a press release announcing its second quarter 2019 results, in which Defendant Lowery stated that:

Although the ***recent decline in interest rates and our revised mortality assumptions*** may trim near-term earnings momentum, ***we remain confident in our planned initiatives for growth as we execute on the priorities*** that we outlined during our Investor Day.

108.    The Individual Life Segment severely plummeted in comparison from its year-ago

quarter:

> Reported an ***adjusted operating loss of $135 million in the current quarter,
> compared to operating income of $43 million in the year-ago quarter.*** This
> decrease includes a more unfavorable comparative impact from our annual
> reviews and update of assumptions and other refinements of $153 million.
> Excluding this item, ***current quarter results primarily reflect less favorable
> underwriting experience, and higher expenses, partially offset by a higher
> contribution from net investment spread results.***

109.    Later that same day, UBS released a report including a harsh critique of

management, explicitly stating that the Company should have revealed this new adverse

information at June 5, 2019, Investor Day conference, which would have permitted investors to

"reset expectations": "[***management] should have used its June investor day to lay out the new

disclosure and reset the bar at that point.***"

110.    Due to less than favorable financial results in Q219, on an earnings call to discuss

the results many analysts were keen on understanding why the assumptions review was not

reasonably similar to the financial guidance Prudential has provided in the past:

**Suneet Kamath- Analyst**

Thanks. On the assumption review, are there going to be any impacts on your
statutory results either in terms of stat earnings or year-end cash flow testing from
these changes?

**Charlie F. Lowrey -Chairman & Chief Executive Officer**

Yeah. For Life the stat assumptions are prescribed, so there wouldn't be a stat
impact for the Life update. And then there would be – and the favorable impact
on the Retirement update would be – would flow through to stat. So, that's the
extent of it.

**Suneet Kamath-Analyst**

Okay. And then on the Life assumption review, I mean, we've been tracking this
obviously every year and it seems like over the past, call it, four years, you've had
maybe $900 million or so of these assumption changes just in the Life business

alone. So, maybe some color on why is it this business that's getting so much of this impact? And are you confident that going to have this behind us now in terms of the current assumptions?

**Stephen P. Pelletier- Chief Operating Officer-US Business & Executive VP**

This is Steve. Let me make some kind of overall comments and then I'd invite Ken to expand further. You're right about our experience over the past few years in the Individual Life business and the annual reviews and most of that experience has been around adjustments on the mortality front including this year's. As a reminder though if you extend to look back over the past six or seven years, our mortality experience has been largely aligned with our expectations over that period. In addition when you look at it from a Prudential total company standpoint, as we've seen the negative mortality experience in Individual Life, that's been offset to a quite meaningful degree with positive longevity experience in our Retirement business very much as designed and intended.

111.     Tanjii followed-up on Pelletiere's response with the following:

Yeah. And the only thing I'd add is just a reminder that some of the updates that we took a few years ago were related to systems conversions and going through that process and that part is behind us. And then also *in terms of assumptions* and evaluating the experience where it's credible*, we call it like we see it and we stay current with that. So, that's the – that's our philosophy with assumptions.*

112.     Pelletier's, Lowrey's, and Tanji's responses were insufficient and lacked clarity regarding assumption changes. Analyst wanted transparency on mortality moving forward:

**Erik Bass- Analyst**

Hi. Thank you. I just wanted to come back to the mortality topic. And I was curious is the deterioration related to any specific vintages or types of policies? Are you really reflecting a broader trend?

**Stephen P. Pelletier Chief Operating Officer-US Business & Executive VP**

Erik, it's Steve. I'll address your question. Main point is that the update is   really related to longer-dated vintages, earlier vintages in our book of business. In regard to looking at specific product categories, the one-time impact is largely experienced in the Universal Life block. The ongoing impact is primarily in Universal Life, but with some impact in other parts of the business as well including [indiscernible] (58:09).

113.     Subsequent to the planned remarks, analysts requested further details concerning the unanticipated unfavorable financial results and concerning the reserve charge in Individual Life due to the changed mortality assumptions, including whether there would be an impact during future periods. Defendant Tanji stated that the impact of the actuarial review was not limited to the current $208 million reserve charge but also would negatively impact future earnings by $25 million per quarter for the foreseeable future:

**Erik Bass-Analyst**

Great. Thanks and good morning. So looking at slide 7, you've baselined the earnings at $3, would annualize to $12. This is quite a significant reduction from the $12.75 midpoint guidance you provided at the outlook call. Now in your prepared remarks you highlighted a number of factors behind that but hoping you can get – run through each of those in some more detail?

**Kenneth Y. Tanji-Chief Financial Officer & Executive Vice President**

Yeah, sure. This is Ken. So, we don't want to update guidance, but what I thought I could do is highlight a few items to consider that were not in our guidance that we gave last December. Now first is we've articulated the Financial Wellness implementation cost, we announced at Investor Day. That's going to trim EPS in the second half of the year. We also updated this quarter our mortality assumptions in Individual Life and that will have an ongoing impact into the second quarter. And then interest rates that we assumed in our guidance, now where we find ourselves were about over 100 basis points below that. Now, that is partially offset by equity markets that are higher, but those two net to a negative. So if you added all those together, that's worth about $0.50 relative to our guidance for the second half of the year.

114.     Analyst Bass wanted clarity as to the financial impact on the Individual Life segment:

**Erik Bass- Analyst**

 And just to be – so, make sure, we have it correct, what would you size that ongoing impact for Individual Life? And is it something that should persist into perpetuity?

**Kenneth Y. Tanji, Chief Financial Officer & Executive Vice President**

[it is] about $25 million a quarter. And it would be reoccurring for the foreseeable future."

115.    On this news, as a result of these disclosures concerning its true financial condition, Prudential's stock price declined more than 10%, from a close of $101.31 per share on July 31, 2019 to a close of $91.09 per share on August 1, 2019, on massive and uncharacteristically high volume of more than 7.6 million shares traded.

116.    On August 1, 2019, J.P. Morgan issued a report on the Company and its second quarter 2019 results, titled "2Q Results Poor, 3Q Guidance Atrocious," commenting that the second-quarter results were "poor." In part, the report concluded that the Company's earnings charge was due to the adverse mortality development in Hartford block:

**Individual Life: Earnings Hurt by Reserve Charge; Outlook Negative**

The individual life business reported a loss of $135 million versus expected earnings of $74 million. . . . Individual life earnings have dropped by almost half compared to four years ago, and we expect them to drop by another third due to updated reserving patterns as part of the 2019 actuarial review. Prudential's individual life business has incurred significant charges as part of the actuarial review process in each of the past 3 years (including 2019). . . . We attribute the poor performance of the individual life business partly to weak results in the legacy Hartford life block that Prudential acquired in 2015[sic].

117.    Following the earnings call, on August 2, 2019, the Company filed its second quarterly report Form 10-Q ("Q219"), which highlighted the changes in operating income by each business segment. When comparing this quarter results to a year-ago quarter, it stated the following:

Adjusted operating income decreased $178 million, primarily reflecting an unfavorable comparative net impact from our annual reviews and update of assumptions and other refinements. ***Results for the second quarter of 2019 included a $208 million net charge from this annual review, mainly driven by unfavorable impacts related to mortality rate assumptions.***

118.     Thus, the mortality rate miscalculation eradicated approximately one-third of the earnings attributable to the Individual Life business segment. As a consequence of these further adverse disclosures in the 2Q19, Prudential's stock price declined another 5.6%, from a close of $91.09 per share on August 1, 2019, to $88.56 per share on August 2, 2019, and to $85.95 per share on August 5, 2019, on a massive volume of more than 4.2 million shares traded on both August 2 and 5, 2019.

## IN REPURCHASING STOCK, PRUDENTIAL RELIED ON THE INDIVIDUAL DEFENDANTS' FALSE OR MISLEADING STATEMENTS

119.     In purchasing common stock in connection with the stock repurchase program, Prudential relied on the Individual Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

120.     Throughout the Relevant Period, Prudential justifiably expected the Individual Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public. Prudential would not have purchased its securities at artificially inflated prices had the Individual Defendants disclosed all material information known to them or that was so obvious it should have been known to them, as detailed herein. Thus, reliance by Prudential should be presumed with respect to the Individual Defendants' omissions of material information as established by the *Affiliated Ute* presumption of reliance.

121.     Additionally, the "fraud on the market" presumption applies to the Individual Defendants' misstatements of material facts or failures to disclose material facts.

122.    At all relevant times, the market for Prudential stock was efficient market for the following reasons, among others:

(a)    Prudential stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b)    As a regulated issuer, Prudential filed periodic public reports with the SEC and the NYSE;

(c)    Prudential regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)    Prudential was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace; and

(e)    The market price of Prudential's stock reacted rapidly to new information entering the market.

123.    As a result of the foregoing, the market for Prudential stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Prudential's common stock. The foregoing facts indicate the existence of an efficient market for trading of Prudential's stock and support application of the fraud-on-the-market doctrine.

124.     Prudential relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Individual Defendants' misstatements and omissions alleged herein.  Had Prudential known of the material adverse information not disclosed by the Individual Defendants or been aware of the truth behind the Individual Defendants' material misstatements, the Company would not have purchased Prudential stock at artificially inflated prices.

### NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO THE INDIVIDUAL DEFENDANTS' MISREPRESENTATIONS

125.     Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

126.     Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important fact that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Prudential or an Individual Defendants who knew that the statement was materially false or

misleading when made. None of the historic or present tense statements made by the Individual Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## DAMAGES TO PRUDENTIAL

127.    As a direct and proximate result of the Individual Defendants' conduct, Prudential will lose and expend many millions of dollars.

128.    Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its chief executive officer, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

129.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

130.    As a direct and proximate result of the Director Defendants' conduct, Prudential has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

131.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered by the Company as a direct result of the wrongful conduct of the Individual Defendants herein.

132.     Plaintiff will fairly and adequately represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

### The Board Failed to Act on Plaintiff's Litigation Demand

133.     On May 18, 2019, Plaintiff, acting through counsel, sent the Demand to the Board demanding that it take action to remedy the wrongful acts concerning Prudential's reckless disregard of the methodology used to establish the Company's reserves, as that its  assumptions were unsound, fallacious, and illegitimate, as set forth in the Demand.  A copy of the Demand is attached as Exhibit A.

131.     Plaintiff received no response to the Demand and on July 29, 2020 sent a second letter to the Board ("Second Letter").  A copy of Plaintiff's Second Letter to the Board is attached as Exhibit B.

132.     After sending the Second Letter to the Board, Plaintiff's counsel received a letter dated July 29, 2020 (the "July 29, 2020 Letter") from Rachel G. Skaistis, Esq. of Cravath, Swaine & Moore LLP.  The July 29, 2020 Letter, states that the Board formed a Special Committee to investigate the Demand's allegations, invited Plaintiff's counsel to participate in a telephone call, and asked for documents demonstrating Plaintiff continuous ownership of Company stock during the time of the wrongdoing detailed in the Demand.  A copy of the July 29, 2020 Letter is attached as Exhibit C.

133.   On August 10, 2020, Plaintiff's counsel provided the Board's counsel with he requested proof of continuous ownership.  On August 13, 2020, Plaintiff's counsel participated in a telephone call with the Board's counsel.  Plaintiff's counsel has received no further updated regarding when the Special Committee expects to complete its investigation.

134.   Pursuant to N.J.S.A. 14A:3-6.3, a shareholder may commence a derivative action after he sends a demand that the corporation takes suitable action and 90 days have expired from the date the demand was made.

135.   More than 90 days have expired from the date Plaintiff sent his Demand. Because the Board has not rejected the Demand, Plaintiff need not allege facts showing that a majority of the Board was not independent. However, the facts demonstrate that the Board was not independent and could not independently act on the Demand.

136.   The Individual Defendants herein and have been, or but for their recklessness would have been aware of the wrongs forming the basis for the claims alleged herein for many years.

137.   Pursuant to Prudential's Principles of Corporate Governance, Prudential:

believes that the long-term success of the corporation is dependent upon the maintenance of an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates.

138.   Furthermore, pursuant to Prudential's Corporate Governance, the Company believes in policies "that directors should be accountable to shareholders, employees, suppliers, customers and society in evaluating the affairs of the corporation."

139.   Nevertheless, the Individual Defendants have failed to protect the Company and by repeating false statements, such as methodology for setting reserves, which was allegedly based on its mortality experience, lacked a rational basis. To the extent the Company's statements are

considered conjecture. Such conjecture did not rest on a reasonable inquiry and did not fairly align with known or recklessly disregarded facts, including the failure to satisfactorily account for known material adverse progression in mortality. Furthermore, the significant misstatements caused an improbable optimistic assessment of Prudential and its business prospects.

140.    Accordingly, the current members of the Company's Board have participated in, acquiesced in, or approved the wrongs alleged herein, and did so in direct violation of their duties to the duties to the Company and its shareholders. They, therefore, participated in a long-term and continuing course of corporate misconduct, mismanagement, and waste. Because of their involvement in the alleged wrongs, the Individual Defendants suffer an irreconcilable conflict of interest regarding the prosecution of this action and cannot exercise the requisite independence necessary to make good faith business judgements. This irreconcilable conflict of interest and lack of independence extends also to the Individual Defendants' ability to pursue any actions against the former officers and directors of the Company.

141.    Lowrey, the Company's CEO and Chairman of the Board, and Falzon have been sued individually in the Securities Action for violations of Section 10(b) of the Securities Exchange Act, for making false statements in connection with: the methodology utilized to determine the Company's reserves; (iii) the stability of reserve levels and the potential that the Company was over-reserved; (iv) the risk that negative mortality trends had already materialized and were impacting the Company; and (v) the strength of the Company's balance sheet, were materially false and misleading. As such, Lowrey and Falzon have an irreconcilable conflict of interest regarding the prosecution of this action, which could likely lead to the discovery of evidence subjecting him to personal liability in the Securities Action.

142.     Because of the severe damage done to the Company by the misconduct alleged herein, the Company has already been subjected to litigation and massive punitive damages awards. As such, it is unlikely that the Board would voluntarily bring suit against those who committed such misconduct for fear of admitting wrongdoing in such litigations.

143.     The members of the Company's Board further cannot be expected to exercise independent judgment in deciding whether they should voluntarily bring suit based on the misconduct alleged herein any demand for an investigation of their own wrongful actions would be futile.

144.     Plaintiff has not made a demand on the other Prudential stockholders because such a demand would be futile. There are over 396 million shares of Prudential common stock outstanding, held by thousands of stockholders. Plaintiff has no ability to identify all stockholders for purposes of making a demand. Even if Plaintiff could make such a demand, the cost of making such demand would be prohibitive.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

142.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Prudential's business and affairs.

144.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants

intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Prudential.

145.    In breach of their fiduciary duties owed to Prudential, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

146.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Prudential's securities.

147.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Prudential's securities.

148.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

149.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Prudential has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff on behalf of Prudential has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

150.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Prudential.

152.     Each of the Defendants received payment from Prudential, in the form of either salary or director fees, while actively breaching their fiduciary duties to Prudential.

153.     All the payments and benefits provided to Defendants were at the expense of Prudential. The Company received no benefit from these payments.

154.     Plaintiff, as a shareholder and a representative of Prudential, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties. Plaintiff on behalf of  Prudential has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

155.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Prudential to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to overpay for Prudential's own stock during the portion of the Relevant Period that at least included the period from February 2019 to February 2020, while the stock price was artificially inflated due to the false and misleading statements and omissions that the Individual Defendants made and/or caused the Company to make, and to lose assets from investors and customers who no longer trust the Company.

157.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

158.    Plaintiff on behalf of Prudential has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10(b)-5

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    During the Relevant Period, the Individual Defendants disseminated or approved materially false and misleading public statements in regard to the methodology utilized to determine the Company's reserves; (iii) the stability of reserve levels; (iv) the risk that negative mortality trends had already materialized and were impacting the Company; and (v) the strength of the Company's

balance sheet. As a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

161.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Prudential, their control over, and/or receipt and/or modification of Prudential's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Prudential, participated in the fraudulent scheme alleged herein.

162.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the time in issue without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Induvial Defendants.

163.    The Individual Defendants were among the senior management and the directors of the Company during the Relevant Period. Based on their roles at the Company, the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

164.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at the Company, the Induvial Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

165.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

166.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud; and

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

## **FIFTH CLAIM**

**Against Defendant Lowrey for Violations of Section 20(a) of the Exchange Act**

167.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.    This Count is asserted on behalf of the Company against Defendant Lowrey for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

169.    During his tenure as an executive officer and/or Chairman of the Board, Defendant Lowrey was a controlling person of all officers of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of his control, Defendant Lowrey had the power and authority to direct the management and activities of the other Company officers, to hire and fire the other Company officers at whim, and to cause the other Company officers to engage in the wrongful conduct complained of herein. Defendant Lowrey was able to and did control, directly or indirectly, the content of the public statements made by all other Company officers during the time period in issue, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

170.    In his capacity as the senior executive, and Chairman of the Board, Defendant Lowrey had direct involvement in and oversight over the day-to-day operations of the Company officers and the Company's employees, who would not act unless Defendant Lowrey agreed with his/her course of conduct.

171.    As a result of the foregoing, Defendant Lowrey, individually, was a controlling person of the other Company officers within the meaning of Section 20(a) of the Exchange Act.

172.    As a direct and proximate result of Defendant Lowrey's conduct, the Company suffered damages in connection with its purchase of Prudential common stock at materially inflated prices.

## **REQUEST FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all the Individual Defendants as follows:

a)      Declaring that Plaintiff may maintain this action on behalf of Prudential, and that Plaintiff is an adequate representative of the Company;

b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Prudential;

c)      Determining and awarding to Prudential the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Prudential and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for more significant shareholder input into the policies and guidelines of the board;

2.      a provision to permit the shareholders of Prudential to nominate at least four candidates for election to the board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

e)      Awarding Prudential restitution from the Individual Defendants, and each of them;

f)      Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

g)      Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 12, 2020

> **BRAGAR EAGEL & SQUIRE, P.C.**
>
> /s/ Lawrence P. Eagel
> Lawrence P. Eagel (N.J. Bar # 038881983)
> 810 Seventh Avenue, Suite 620
> New York, NY 10022
> Tel: (212) 308-5858
> Fax: (212) 486-0462
> eagel@bespc.com
>
> **MOORE KUEHN, PLLC**
> Justin A. Kuehn (*Pro Hac Vice* Motion Forthcoming)
> Fletcher W. Moore (*Pro Hac Vice* Motion Forthcoming)
> 30 Wall Street, 8th floor
> New York, New York 10005
> Tel: (212) 709-8245
> jkuehn@moorekuehn.com
> fmoore@moorekuehn.com
>
> *Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, Robert Lalor, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Prudential Financial Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _____6th_____ day of November 2020.

*Robert S lalor*
Robert S lalor (Nov 6, 2020 11:06 EST)
_____

ROBERT LALOR

# Exhibit A



# Moore
# Kuehn

Justin A. Kuehn

May 18, 2020

**BY CERTIFIED MAIL & EMAIL**

Board of Directors
Prudential Financial Inc.
c/o Margaret M. Foran, Chief Governance Officer
751 Broad Street
Newark, NJ 07102
     investor.relations@prudential.com
     independentdirectors@prudential.com

*Re: Prudential Financial, Inc. Stockholder Litigation Demand*

Dear Board of Directors:

We write on behalf of our client, Robert Lalor (the "Stockholder"), a holder of Prudential Financial, Inc. ("Prudential" or the "Company") common stock since 2002. The Stockholder demands that the Company's Board of Directors (the "Board") investigate and pursue all possible claims on behalf of the Company against certain current and former directors and officers of the Company, as detailed below. The Stockholder believes that, at least, Prudential's President and Chief Executive Officer ("CEO"), Charles F. Lowrey ("Lowrey"), its Chief Financial Officer ("CFO"), Kenneth Y. Tanji ("Tanji"), Robert D. Axel, Thomas J. Baltimore, Jr., Gilbert F. Cassellas, Mark B. Grier, Martina Hund-Mejean, Karl J. Krapek, Peter R. Lighte, George Paz, Sandra Pianalto, Christin A. Poon, Douglas A. Scovanner, John R. Strangfeld, and Michael Todman violated their fiduciary duties and other duties owed to the Company (the "Officers and Directors").

As fiduciaries, and because of their ability to control Prudential's business and affairs, each of the Officers and Directors owed the Company and its stockholders the duties of good faith, loyalty, and care.  The Officers and Directors were/are required to manage the Company in a fair, just, and honest manner, including, but not limited to, to act in compliance with all applicable laws, rules, and regulations.  Additionally, the Officers and Directors are required to be informed regarding how Prudential conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquires in connection therewith and take action necessary to correct such conditions and make public disclosure to comply with applicable law.

*Prudential Financial, Inc. Stockholder Litigation Demand*
May 18, 2020
Page | 2

   As set forth below, the Stockholder believes that the Officers and Directors violated their fiduciary duties to the Company and/or aided and abetted such breaches of fiduciary duty and were also unjustly enriched to the detriment of Prudential. Accordingly, the Company must investigate and bring an action against the Officers and Directors seeking damages and restitution. Lastly, the Company must adopt and supplement its corporate governance reforms immediately.

**OVERVIEW**

   Prudential provides insurance, investment management, and other financial products and services to both individual and institutional customers throughout the United States and in many other countries. The Company's principal products and services include life insurance, annuities, retirement-related services, mutual funds, and investment management.

   Beginning in February 2019, the Officers and Directors caused or allowed Prudential to disseminate materially false/misleading statements and/or conceal material adverse facts for at least six months concerning the Company's business, operations, management, and intrinsic value. Specifically, the Officers and Directors willfully or recklessly caused the Company to issue materially false/misleading statements and/or conceal material that adverse facts that (1) the Company's reserve assumptions failed to account for adversely developing mortality experience in the Individual Life business segment, (2) the Company was not over-reserved, but instead, its reported reserves, particularly for the Individual Life business segment, were insufficient to satisfy its future policy benefits liabilities, and (3) the Company had materially understated its liabilities and overstated net income as a result of flawed assumptions in calculating mortality experience.

   For example, on February 15, 2019, Prudential filed with the SEC its annual report on Form 10-K (the "Form 10-K"). The Form 10-K stated that current reserves for future policyholder benefits would be greater than necessary because of the current low-interest-rate environment. According to Form 10-K, Prudential's methodology to establish its reserves are assumptions based on the "company's experience, industry experience and/or other factors, as applicable." Prudential's assumptions included: mortality, morbidity, retirement, and policyholder behavior assumptions. The Form 10-K further provides that reserves were updated quarterly and forecasted that modifications were improbable to occur in the short term. The Form 10-K elaborated that if a deviation in the mortality trend occurred, the changes could necessitate an increase in reserves, but any such deviation would be gradual over the long-term. The Form 10-K gave the appearance that the Company's earnings and pecuniary strength were notably understated when they were not.

   Following the filing of the Form 10-K, on May 1, 2019, the Company issued a press release announcing its financial results for the first quarter of 2019, including an earnings per share ("EPS") of $3.00, which missed analyst expectations. However, despite disappointing earnings results, Lowrey misrepresented Prudential's balance sheet in the release as "rock-solid." The next day, on an investor conference call, Lowrey again misrepresented that the Company's

*Prudential Financial, Inc. Stockholder Litigation Demand*
May 18, 2020
Page | 3

balance sheet was a great indicator of the Company's strength because it "should lead to growth in our business and greater value for shareholders."

Similarly, on June 5, 2019, at the Investor Day conference, Tanji addressed Prudential's annual actuarial review and explained that mortality rate was," between the range of what we'd expect normal volatility but net it has been below our experience."

However, on July 31, 2019, Prudential issued a press release announcing (1) earnings per share of $3.14, $.09 below analyst consensus estimates, (2) it would take a pre-tax charge off to reserves of $208 million, and (3) the Individual Life business segment had lost $135 million.  In the release, Lowrey admitted that "revised mortality assumptions" had negatively impacted the Company and may "trim" near-term earnings. On August 1, 2019, on an investor conference call, Tanji disclosed that the change in mortality assumptions would have a much more significant effect on the Company's financial condition and would require a negative earnings impact of $25 million per quarter for the foreseeable future. Thus, the mortality rate miscalculation eradicated approximately one-third of the earnings attributable to the Individual Life business segment.  On August 2, 2019, Prudential filed with the SEC its quarterly report on Form 10-Q (the "Form 10-Q").  The 10-Q provided that the $208 million charges to reserves were attributable to the Individual Life business segment.

The Officer and Directors knew or acted with reckless disregard of the methodology used to establish the Company's reserves, as that its assumptions were unsound, fallacious, and illegitimate. The Officers and Directors knew or recklessly disregarded the following facts: (1) the Company's reserve assumptions failed to account for adversely developing mortality experience in the Individual Life business segment, (2) the Company was not over-reserved, but instead, its reported reserves, particularly for the Individual Life business segment, were insufficient to satisfy its future policy benefits liabilities, and (3) the Company had materially understated its liabilities and overstated net income as a result of flawed assumptions in calculating mortality experience.

## DAMAGES TO PRUDENTIAL

As a result of the Officers' and Directors' unlawful course of conduct, the Company and certain of its directors and officers are now subject to federal securities fraud class-action lawsuits in the United States District Court for the District of New Jersey.  As a result, Prudential has/will expend significant sums of money, including, but not limited to, fees paid to outside lawyers, accountants, and investigators in connection with internal investigations.  Additionally, the Officers' and Directors' failure to uphold their duties have proximately caused Prudential to lose approximately 100 million dollars yearly for the "foreseeable future."  Prudential's reputation is damaged within the business community and in the capital markets.  These material misstatements and omissions catalyzed, creation of an unrealistic, positive assessment of Prudential and its business prospects.  Thus, as a further direct and proximate result of the misconduct described herein, Prudential has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar discount" that will plague the Company's stock in the future.

*Prudential Financial, Inc. Stockholder Litigation Demand*
May 18, 2020
Page | 4

## STOCKHOLDER DEMAND

Given the above, the Stockholder demands that the Board takes all necessary steps to investigate, address, and promptly remedy the harm inflicted upon Prudential as a result of the misconduct described herein.  The Stockholder demands the Board investigate the circumstances surrounding Prudential's business practices, operations, financial conditions, performances, growths, operations, financial statements, and markets and violation of any applicable laws, rules, and regulations. The Board must investigate the misconduct detailed herein, consisting of independent and disinterested directors and officers with the assistant of independent legal counsel. Prudential must also adopt corporate governance improvements to prevent similar abuses and harm immediately.

The Board must commence this investigation and these legal proceedings as expeditiously as possible, keeping a detailed written record of its efforts and keeping in mind the relevant statute of limitations.  If Prudential does not take appropriate action within a reasonable period of time, the Stockholder will commence a stockholder derivative lawsuit on behalf of the Company to obtain appropriate relief.

Lastly, this stockholder demand also serves to put all affected entities and individuals identified herein on notice of their document preservation and collection responsibilities.

Should you have any questions or concerns about this matter, please do not hesitate to contact me.

Very truly yours,

Justin Kuehn

# Exhibit B



# Moore
# Kuehn

Justin A. Kuehn

July 29, 2020

**BY CERTIFIED MAIL & EMAIL**

Board of Directors
Prudential Financial Inc.
c/o Margaret M. Foran, Chief Governance Officer
751 Broad Street
Newark, NJ 07102

     investor.relations@prudential.com
     independentdirectors@prudential.com

*Re: Prudential Financial, Inc. Stockholder Litigation Demand*

Dear Board of Directors:

We write on behalf of our client, Robert Lalor (the "Stockholder"), a holder of Prudential Financial, Inc. ("Prudential" or the "Company") common stock since 2002. On or around May 18, 2020, the Stockholder served a litigation demand (the "Demand") on the Company's Board of Directors (the "Board") to investigate and pursue all possible claims on behalf of the Company against certain current and former directors and officers of the Company. As of the date of this letter, we have not received a response to the Demand.

We write to notify the Board that if we do not receive a response within twenty days of this letter, we will interpret that failure to respond as evidence of the Board's refusal of our Demand and proceed accordingly. We are, of course, willing to assist the Board in any investigation it conducts and will review and comment upon all reports and information generated in the course of its work.

Should you have any questions or concerns about this matter, please do not hesitate to contact me.

Very truly yours,

Justin Kuehn

cc: Lawrence P. Eagel, Esq.

# Exhibit C

CRAVATH, SWAINE & MOORE LLP

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
MARK I. GREENE

DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

————

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
+1-212-474-1934

WRITER'S EMAIL ADDRESS
rskaistis@cravath.com

KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER
O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
MARGARET SEGALL D'AMICO
RORY A. LERARIS
KARA L. MUNGOVAN

NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL L. MARIANI
LAUREN R. KENNEDY
SASHA ROSENTHAL-LARREA
ALLISON M. WEIN
MICHAEL P. ADDIS
JUSTIN C. CLARKE
SHARONMOYEE GOSWAMI
C. DANIEL HAAREN
EVAN MEHRAN NORRIS
LAUREN M. ROSENBERG

————

SPECIAL COUNSEL
SAMUEL C. BUTLER

————

OF COUNSEL
MICHAEL L. SCHLER
CHRISTOPHER J. KELLY

July 29, 2020

<u>Lalor Shareholder Litigation Demand</u>

Dear Mr. Kuehn:

      I write in response your May 18, 2020 and July 29, 2020 letters to the Board of Directors (the "Board") of Prudential Financial, Inc. ("Prudential" or the "Company") on behalf of Robert Lalor, whom you identify as a Prudential shareholder. Your May 18 letter has been referred to a Special Evaluation Committee of independent directors (the "Special Committee"). The Special Committee will investigate the allegations and demands contained in your letter and report back to the full Board with its recommendations upon completion of its work. The Special Committee consists of independent directors Christine Poon, Martina Hund-Mejean and Michael Todman. Ms. Poon, who serves as Chair of the Special Committee, joined the Prudential Board in 2006, and Ms. Hund-Mejean and Mr. Todman joined the Board in 2010 and 2016, respectively. Our Firm is independent counsel to the Special Committee to assist it in its work.

      At this early stage it is difficult to estimate precisely how long the Special Committee will need to complete its investigation, but we anticipate the process will take at least several months. In the meantime, I invite you to provide us with any information you have concerning your client's allegations that you did not set forth in your May letter, including any information concerning any purported breaches of fiduciary duty or improper conduct by Board members or Company management. I am happy to participate in a telephone call to discuss any such additional information.

      Finally, your May letter states that Mr. Lalor has been "a holder of Prudential . . . common stock since 2002" but it does not include evidence of your client's stock ownership during any period. A demanding shareholder must not only show that he is currently a shareholder, but also that he was a shareholder at the time of the conduct about which he complains. Accordingly, I request that you please provide

documentation showing Mr. Lalor's continuous ownership of Prudential shares during the period when the alleged wrongdoing occurred and up through today, including evidence of both the date on which your client acquired Prudential stock and that he continues to own shares in the Company.

Sincerely,

Rachel G. Skaistis

Justin Kuehn, Esq.
    Moore Kuehn, PLLC
        30 Wall Street, 8th Floor
            New York, NY 10005
                jkuehn@moorekuehn.com

BY E-MAIL AND FEDEX

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS
ROBERT LALOR, derivatively on behalf of PRUDENTIAL FINANCIAL, INC.

### DEFENDANTS
SEE ADDENDUM TO CIVIL CASE COVER SHEET

**(b)** County of Residence of First Listed Plaintiff  Monmouth, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Essex County, NJ
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Lawrence P. Eagel, Esq., Bragar Eagel & Squire, P.C.
810 Seventh Ave., Ste. 620, New York, NY 10019
Tel.: (212) 308-5858

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                           *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[x] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | | **LABOR** | **SOCIAL SECURITY** | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | **CIVIL RIGHTS**<br>[ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | [ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |

### V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Violations of Sections 10(b) and 20(a) of the Exchange Act & Rule 10b-5 promulgated thereunder (17 C.F.R.§240.10b-5)
Brief description of cause:
Shareholder derivative action for violations of the securities laws, breach of fiduciary duty, waste of corporate assets and unjust enrichment.

### VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ in excess of $250,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes   [ ] No

### VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE  Honorable Stanley R. Chesler
DOCKET NUMBER  20-cv-12772

DATE
November 13, 2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## ADDENDUM TO CIVIL COVER SHEET CAPTION

CHARLES F. LOWREY, KENNETH Y. TANJI, ROBERT M. FALZON, MARK B. GRIER, THOMAS J. BALTIMORE JR., GILBERT F. CASELLAS, , MARTINA-HUND-MEJEAN, KARL J. KRAPEK, PETER R. LIGHTE, GEORGE PAZ, SANDRA PIANALTO, CHRISTIN A. POON, DOUGLAS A. SCOVANNER, JOHN R. STRANGFELD, and MICHAEL TODMAN

     Defendants,

PRUDENTIAL FINANCIAL, INC.,

     Nominal Defendant.